Good morning. May it please the court and Telefero for the appellant in this case, Mr. Bruce Holder. Mr. Holder has raised a number of issues in this case and I would like to focus, well I would like to start with the denial of a public trial issue, then go to a portion of the constructive amendment issue that's relative to counts one and three, and then if there is time, hit briefly on the sufficient evidence of death issue as with regard to count two. First, the district courts, we have argued that the district court's restrictions on public access to the trial violated the Sixth Amendment. We have 100% acknowledged that the courts and the world were navigating an unprecedented time during Mr. Holder's trial and right before. We also acknowledge that Mr. Holder's trial was a pilot trial and it was the first trial in this district. So everybody was trying to figure out what to do. Protocols were being fashioned, protocols were being put into place. But nevertheless, the trial must still comport with due process and other fundamental constitutional rights that come with the trial still must be afforded. So and certain constitutional rights still do not give way, even in light of the pandemic. So one of the fundamental rights that we believe was not afforded that could have been absolutely afforded in this case, even in light of COVID, even in light of the restrictions and the protocols that had been put in place, was Mr. Holder's right to a public trial. And even if it was justified, even assuming that it was 100% justified not to allow the public to have absolute access or any access to the courtroom in and of itself, the ability existed to allow people, the public, to pop in via, we call it Webex, I don't know if you guys use Webex, but pop in during video. And it was 100% able, capable to allow the public to have a link to pop in and listen over audio. Did the district do that in other cases during the pandemic? Yes, and yes. And there's a case that I can't think of right now, but it's from, I believe it's the Ninth Circuit. And they looked at kind of the protocols being put in place around the country. And Judge Arguello was following a policy developed by the District of Colorado? Yes, yes. Well, we had that Venomo case recently.  Which had a similar issue. Right. How is that distinguishable or is it controlling here? Well, I mean, in Venomo, I mean, the issue was that I can't, I can't, I believe that they said that it wasn't, well, the public trial wasn't afforded and it could have been. I can't quite remember what they did. If they put an audio only or they put an audio and video. It had audio only. They had audio only. And this was audio only if people, people could call in. This was audio only. But the problem here is twofold. One, we're asserting that they also could have popped in video over video. But second, the audio link wasn't put out to the general public. It wasn't made available to the general public. It was only given to the parties and then the parties could distribute it to, you know, whoever they wanted. But in this case, the general right to a public trial was in no way afforded because the link wasn't available to the general public. It wasn't put on. It could have been. Couldn't a member of the public ask the clerk for the call in number? Well, I mean, I guess they could have. But it's not up to the public or the defendant or even the government to say, to ensure that the right to a public trial is. The trial court had, if the trial court was going to not allow the public into the courtroom, it was the trial court's responsibility to ensure that there were reasonable means to afford that right. It was the trial court's responsibility to do that. And when they put these protocols in place, I believe that it was represented to everybody that a link would be available. When they found out that a link wasn't available, Mr. Holder not only objected to the idea that a video link wasn't available, but Mr. Holder, through his counsel, also objected that the link to the call in was not afforded to the public. I understand that there were some members of the public at the trial, guests of either the prosecution. Did the defendant have any? The defendant had nobody there. And the only members of the public, I believe, was a mother of one of the victims and her colleague. So they were aligned. And the court allowed them in the courtroom because victims' rights allow them to be in the courtroom. So even though they were in the courtroom, we have still argued that it was still a complete closure. But whether it's a total closure or a partial closure, it doesn't matter because it still has to be, the closure has to be no broader than reasonable. And again, because the- Well, if it's a partial closure, then the standard's a little more lenient, right? The standard's a little different in the sense of justifying the closure. But you still have to not, you know, it still cannot be more broad than necessary. You still have to find a reasonable way. And again, in light of the technology at this time, in fact, during this time, it was probably more possible. That's improper English. It was probably more capable to allow the general public to be in because of the technology that had been- If there had been a video link with that, would you be here on this session? If there had been a video link, no. So that's the fatal flaw. No, no, no. And quite frankly, if there had been a telephone link made available to the general public, we wouldn't be here. But the fact is, is that the public in general did not have a way of knowing about this trial, of popping in, unless they came to one of the parties and asked. It was not put on the website. It was not made available to the general population. In these circumstances, should we find that there's a structural error, or is this a case where we should look and see if there's any prejudice to the defendant? And if it's a prejudice standard, is there any prejudice to Mr. Holder? I believe it is a structural error in this case because it was preserved, because they did object to it. And the courts have found that preserved issues, you do not have to show harm to a public trial. It is a structural error. Let me ask you, for somewhere in the briefs, I think I saw that there was a question that your client raised the issue that he wanted his speedy trial, even against what was going on as far as your argument about the public being there. Bring me up to date as to exactly that discussion that went on when he was insisting upon having the speedy trial and complying with that, and then you have the orders in regards to the COVID aspect of it. Help me out there. So, I believe there was an initial trial that occurred in 2020, right at the beginning of COVID, and they could not seat a jury. And so from there until 2021, when they finally had the trial, there were a lot of discussion about how to do this. Mr. Holder repeatedly demanded his right to a speedy trial, repeatedly invoked that right. I believe it was a few weeks before this April trial, April 21 trial was set, but it was just generally set because nobody still knew what was going to happen and what protocols were going to be in place. April 21 of what year? April 2021. April 2021, sorry. And I believe the record shows it was a couple of weeks before that trial date. They were informed, I believe, through email that they were going to be the pilot trial. So, the judge started to put in these protocols, and they objected to the protocols, I believe. Who's they? Mr. Holder and his attorneys. Protocols such as masks, things like that. There was not a general objection to the public trial issue because the court had represented or the court had indicated that a link was going to be made available to the public. So, I believe on the first day of trial, they still made objections to the general things such as wearing masks, such as doing opening statements prior to even picking the jury, certain protocols that were put in place. No objection was necessarily made about the link at this point because they still believed that a link was being put out to the trial. When they made that objection on the first day of trial to these protocols, I believe the judge said something to the effect of, and I'm paraphrasing, you had your choice of coming to trial under these protocols or you could have put it off for a different time and you demanded your speedy trial. So, we're here, so you're going to deal with the protocols. I believe it was on day five of the trial. So, there was, I believe, two days of jury, picking the jury, and then on day five of the trial, it was brought to their attention that the video link or the audio link was not available to the public. And so, the attorneys, Mr. Holder's attorneys, made a record, and this is at volume three, around page 578. They get up and they say, Mr. Holder has been asking us to make an objection specifically that the public is not being allowed to pop in and see this trial. So, they made that on behalf of Mr. Holder. They then also made the objection or brought it to the court's attention that they did not believe that the audio link had been made available generally to the public. This was five days into the trial? This was in five days. They brought it to the court's attention. I mean, it's within five days of the trial before this objection is made. Yes, yes. Because they still believe that a link had been put out for the general public. And it seems that Mr. Holder had been telling them to object to video. And I believe that the government may characterize it as he was being a difficult person. But he was definitely telling his attorneys to make this objection. On day five, they make this objection, at least to the video. They, on day five, say, we don't believe that the audio link is made. And the court basically just noted the objection and moved on. They confirmed that the audio link was not available to the general public, and they moved on. So there was no, at least from day five on, this was an eight-day trial, at least if we're going to get into what part of this was preserved or not. At least from day five on, the court knew that there was no general audio link, at least, available and did nothing about it. She noted the objection, didn't make any other findings or anything like that. So at least for that part, which was three days' worth of testimony and closing arguments, at least for that part of the trial, which obviously is a critical part of the trial, there was absolutely no public access to the trial. Because you were asked a question about structural versus the prejudicial aspect of it. What is your best case saying that this is a structural error? United States Venomo does say, as to the merits of a preserved claim, it says if this court agrees there was error, it is structural and reversal is required. And that's Weaver v. Massachusetts, too. So it's in Venomo, and it's in Weaver v. Massachusetts. If it was not objected to, then you probably would have to look for plain error or whatever. But at least from day five on, it's structural. You put your finger right on what I was asking. Right. When was the objection made? Right. Well, and I also think, too, it's a little bit hard because they believed that that audio link was out to the general public. And when they found out that it had not been presented to the general public, that is when they objected. So, in a sense, you also look at the fact that it's the trial court's responsibility to find a proper alternative means, and then they did not. You might have answered the question, but under the policy, could I have called the clerk's office and said, I want to attend this trial, and the clerk would have said, no, but you could listen in, and here's a number? I mean, it takes some affirmative work by a member of the public. By a member of the public, right. Could that have happened? I imagine that it could have. But that's not the purpose behind the right to a public trial. But how is that different than somebody just wandering up to the courthouse, like today, and coming in this courtroom? Well, because the court wasn't open, and so I guess they... No, I'm just saying it's the functional equivalent of calling the clerk and getting the phone number. Well, the problem is that this person could not have wandered up to the courthouse and have been let in. That's why it was a closure. So the court was responsible for finding a reasonable alternative that was no broader than necessary so that that person who just wandered up to the courthouse could have had access. It needed to be on a website or on a piece of paper on the front door? He could have gone to the website and saw, oh, there's a trial here today, and popped in, but he could not have done that. And I know your time's over, but just quickly, could you give me your constructive amendment argument? Yes. So the constructive amendment argument is with regard to Counts 1 and 2, and it's based on the principles that the government chooses what they indict. They choose the language that they indict. And when the grand jury passes upon that language, you're bound by the plain language of the indictment. And the jury instructions thereafter and the evidence thereafter has to comport with the particulars of the indictment. With regard to Count 1, I'll go to Count 1, I want to focus on the specific object of the conspiracy because through the argument and the jury instructions, well, let me say this. So Count 1 charges that these conspirators conspired to distribute and possess with intent to distribute 400 grams or more of a mixture of substance containing fentanyl. And this substance and such substance, excuse me, without authorization bore an identifying mark that falsely purported to be the product of Malincrop Inc. So it was not, they did not charge conspiracy to distribute fentanyl. They did not charge conspiracy to distribute a counterfeit substance. They charged, the indictment charged, a conspiracy to distribute a counterfeit substance containing fentanyl. And it's different. So they charge a specific crime and instead the jury was instructed that they could either find, either or, find a conspiracy to distribute fentanyl or a conspiracy to distribute a counterfeit substance. That's not what the charge says. It was a conspiracy to distribute a counterfeit substance containing fentanyl. And you objected to the jury instructions? No, no. And that's why it has to go through plain air. Okay. Thank you, Counsel. Thank you very much. Let's hear from the government. Good morning, Your Honor. May it please the Court. Kyle Brenton for the United States. Facing unprecedented challenges due to a global pandemic, the District Court nevertheless provided Bruce Holder with a fundamentally fair trial that reached a just result. None of his arguments for reversal have merit and the judgment should be affirmed. I'm happy to talk about the COVID issue, which I think my opposing counsels primarily talked about, and address constructive amendments, efficiency, those other issues as the Court has questions. First, I'd like to go to Judge Baldock's questions and Judge Timkowitz's questions about the timeline. Because I think the timeline of how this all unfolded, as COVID is also unfolding, is particularly important. So Holder's first trial was convened on March 13, 2020, which is the same day the President declared a national emergency for COVID. On that day, not enough jurors showed up for a panel, so a mistrial was declared. At that point, we have a series of attempts to reset the trial, because, as Judge Baldock points out, Mr. Holder is insisting on his speedy trial rights throughout. And if you look in our brief, we have a series of citations on this point to all of his different oppositions to speedy trial continuances. Then you get to June of 2020. In June of 2020, the Chief Judge of the District of Colorado issued a set of jury trial protocols. Those are in the record in Volume 2, pages 309 to 312. And those protocols, which are issued, again, June of 2020, almost a year before the trial here, they are still what governed the trial in terms of COVID precautions. Now, what those protocols said about public access is on page 312, and it says, because the gallery will be occupied by the jury, spectators will not be permitted in the courtroom. An audio link will be provided to allow members of the public to call in and listen to the proceedings. That's all the court said. Now, there's no dispute here that the courtroom deputy provided the parties to this case with that dial-in number. That's absolutely undisputed. And to Judge Timkovich's question about calling the clerk's office, if you look at Judge Arguello's order on the post-trial motions, she also talks about the Chief Judge's general orders. And if the court looks at general order number 2020-10, and that did not make it into the record in this case, but they are publicly filed on the district court's docket, and I can give you that case number if you like. But that 2020-10 says for proceedings, essentially for proceedings closed to the public, any member of the public or press who wants to view can call the clerk's office to obtain the dial-in number for that proceeding. So we have these protocols coming out in June of 2020. Was video eventually provided as a part of the protocol? You know, Your Honor, I'm not certain of that. I believe it eventually was, but I think, again, the timing is critical. So here, the trial was in April of 2021. Ms. Talaferro mentioned that it was a pilot trial. I believe there were two trials happening this same week, one before Judge Arguello, one before Judge Jackson. Neither had a video link for the public. So they were both taking place under this audio dial-in for public access regime. To the extent video was later figured out by the district, that was not the case at the time of this trial. So we have the protocols in June of 2020. Shortly thereafter, Holder's counsel files written objections to those protocols, because, again, we keep trying to reset the trial date over the course of this year. Those written objections, they're all about, you know, witnesses wearing masks, cross-examination, lawyers wearing masks, all of the kind of core COVID precaution issues. He never mentions a public trial objection. And, again, I want to go back to that language of the protocols. An audio link will be provided. That's all the court said. Now, my opposing counsel says they believed, or the court told them, that this link would be somehow made available to the public. That's not what it says. It says will be provided. There's no more detail than that. But given the thoroughness with which Holder did object to the more substantive core trial issues here, I think it's not unreasonable to ask him, if he's assuming that something is going to happen with regard to this public access number, ask the question. So we have those written objections. Then we get to this trial. On day one of this trial, his counsel renews his objections to the COVID trial protocols that were made in that written objection almost a year prior, does not add anything with regard to a public trial. So then we have two days of jury selection and openings. We have two days of evidence. We get to day five. On day five, first thing in the morning, Holder's counsel makes the objection that my opposing counsel read to the court. It is certainly an objection. I think it is best described as a perfunctory objection. There's no discussion of what the standard is, of what the court needs to do. And again, we are five days in to an eight-day trial. Well, how was the objection made? I mean, you're saying there was no particular way. Did he say object or what? Well, it's what my opposing counsel read to the court. It's from Volume 8, page 578. The first paragraph is counsel says, Mr. Holder has asked us to make an objection to the deficiencies of this being a public trial. He asks for video. And then he says, additionally, we have concerns about what may be the lack of access to the call-in number. I don't know for sure. I know the court distributed information to counsel concerning the phone-in number. That has been available to us. Whether that number is on the website or otherwise available, I don't know the answer to that question. Thank you. No objection is made to specifically say that I object to the violation of the speedy trial? Well, he says, the first paragraph, the first sentence of that is, Mr. Holder has asked us to make an objection to the deficiencies in the trial being a public trial. And everything else that he says comes after that on the fifth day. Is that a sufficient motion? I think that given the timing, given the course of proceedings that I've just laid out, given the salience of the COVID issues here, I think that's not sufficient. I mean, it's a very close question, Your Honor. I think it's significant because, you know, as the court has obviously honed in on, to the extent this was a properly preserved public trial objection, there is a structural error. To the extent there's not, he certainly would have to show prejudice under a plain error standard, which he cannot do and has not done. But in our cases specifically provide as to how a proper objection should be made in regards to failure to give a speedy trial? Well, I think, Your Honor, I don't know that there is a specific standard as to a public trial objection. I think the general standard of making the court aware of the error and asking the court to fix it is probably the standard. I think that this case is a little unique because of the timing, because that objection, to the extent it was sufficient, was not made until halfway through the trial. So you're saying in this case it was specific enough? I don't think it was specific enough, Your Honor. I want to be clear about that. We are not conceding that that objection was sufficient to preserve this argument. We are arguing waiver, as we discuss in our brief. I'm happy to move on to the standard here because I think, you know, we get to the total partial question and the standard. I think those are very important questions. We have the protocols, and they did something, but, you know, did they do enough? That's exactly the question, Your Honor. Our position is they did not do enough. Well, counsel, can I just jump in there before you move on? Is your objection, I guess you're making two objections, the sufficiency, as you phrase it, of the objection, it's insufficient. What should they have said? Well, I think, Your Honor, I think they should have said that in order to make this a public trial, the number needs to be publicly available. Well, didn't they say that? They say that, but then as the discussion goes on, on the next page, the court checks with the courtroom deputy. The courtroom deputy says, we gave the number to the parties, and the court essentially says, okay, moving on. I think at that point, it was incumbent on counsel to make a sufficient objection to make the record of what was and was not available, and to ask the court directly to put that number on the website or on the calendar or something. And I don't think that happened. I think as soon as it was clear that the parties had the number, everybody just moved on. So to the point where I think that that objection needed more, I think that's what it needed. I think also the timing issue, if I have the right. Right. So it's both the sufficiency and the timing? It's the timing in light of the very long history of making COVID objections, but not this COVID objection until half the trial is gone. That's the issue. Okay. Well, if we were to agree with you, where would that leave us? I mean, I think that that would leave the court in a somewhat challenging position, potentially, but only if there's an underlying violation of the Sixth Amendment here, which I don't think that there was. So I think that takes us naturally to the merits of the Sixth Amendment question. So in analyzing this closure, the first question the court has to answer is whether it was total or partial. And the answer here is partial. In Waller, the Supreme Court told us what a total closure is. A total closure is excluding everyone other than the parties, witnesses, lawyers, and court personnel. If you look at the Nieto case from this court, that's exactly how the court analyzed the question. It basically said, all right, Waller says these four categories of people. Was anybody else there? Yes, it was partial. And here you had spectators, as Judge Timkovich noted. In this case, they were family members of victims, but they were spectators beyond the people in Waller. And you also had the ability for anyone to dial in. Well, I will also say there were spectators there. Holder had the opportunity to ask for anybody to come. He didn't. But we also had the audio dial-in number that would have allowed anyone to listen. So those things make this a partial rather than a total closure. So why does that matter? But you had to do some work to get the number, right? As Your Honor recognized, yes. I mean, the same kind of work you would have to do to walk into the court and go look at the calendar on the outside of the courtroom, you'd have to call the clerk's office and say, you know, what trials are on? Can you give me the number? I think that's not really significantly more work than just going to the court to see what's on today. Now, so Holder insists that it doesn't matter whether it's total or partial because the standard is the same, and that's not the case. So if you look at Nieto, Galloway, Addison, and in particular Christie, this court has sort of repeated over and over in every partial closure case that we do not impose that requirement, that the closure be no broader than necessary, that the court consider every reasonable alternative, including alternatives not proposed by the parties. And I think I highlight Christie because in that case, the defendant asked for that full Waller four-factor analysis, and the court said, no, no, no, we don't do that for partial closures. For partial closures, the question is, is the interest substantial, and has the court made a record sufficient for appellate review? Now, I think that the court's, the interest here is protection of health and COVID. I think there's really no dispute that that was sufficient for either a partial or a total closure. On the findings, Judge Arguello found in her order on the post-trial motions that her closure was no broader than necessary because it complied with CDC guidelines and the protocols and general orders of the chief judge raising those guidelines. And there's been no challenge to the underlying facts there. So I think that this closure certainly passes muster as a partial closure, even if it was preserved, Your Honors. I'm happy to move on and discuss the constructive amendment issue as the court sees fit. I know my time is winding down. I think, yeah, could you respond on the constructive amendment? Certainly. I think that there's a broad way to resolve all these constructive amendment questions, and then there are some narrow case-specific ways. The broad way is just hornbook law on indictments. The indictment sets the outer bounds of what a defendant may be convicted of, but that does not mean that the petit jury has to find every single thing that is alleged in the indictment in order to convict. This goes right back to the Miller case from the Supreme Court from 1985. As long as what the defendant is convicted of states a violation of the statute and it is encompassed within the outer bounds of the indictment, there has been no constructive amendment. So the particular point that my opposing counsel brought up here, the objects of the conspiracy, in that Miller case, the court made clear that, you know, you can be charged with two different means of committing a crime in an indictment, and the government only has to convict you on one or the other, and convicting on one but not the other is not a constructive amendment, even if it's charged in the conjunctive with an and. So here we have distribution of a counterfeit substance, distribution of a substance containing fentanyl. Well, the jury found both of those things. They checked yes on both of those specific questions, and that's the narrow way to resolve this case. Even if that hadn't been the case, both of those means, both of those objectives of the conspiracy were alleged in the indictment. So either or both was fair game at trial without constructively amending the indictment. And I think that applies to all of the alleged constructive amendments here. If the Court has no further questions, I'll ask that the judgment be affirmed.  Thank you, counsel. I appreciate your argument. You're excused. Thank you.